UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

CARTIER INTERNATIONAL B.V.;
RICHEMONT INTERNATIONAL, S.A.;            06 Civ. 3917
ALFRED DUNHILL LTD.; LANGE
UHREN GmbH; and MONTBLANC-SIMPLO,
GmgH,

Plaintiffs,                  OPINION

-against-

ILAN BEN-MENACHEM; DAVID BEN-MENACHEM;
KING REPLICA; DAVIDS LUXURY; REPLICA
KINGDOM a/k/a SWISS KINGDOM; BRANDED
LUXURY d/b/a/ BS GIFTS; VERTEXO, INC.;
AVIV BEN-MENACHEM; CHANA BEN-MENACHEM;
TRAVEL DERECH TSLECHA; AVILAN
MARKETING LLC; JOHN DOES 2-10; JANE
DOES 2-10; AND XYZ COMPANIES 3-10,



Defendants.

------------------------------------------X

A P P E A R A N C E S:

Attorneys for Plaintiffs

GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue
New York, NY  10166
By:  Harley Lewin, Esq.
     Scott Gelin, Esq.

**Sweet, D.J.**

For the reasons set forth below, the Plaintiffs'
motion for summary judgment, which is unopposed, is granted.

## Prior Proceedings

The Plaintiffs commenced this action on May 23,
2006, and on that date, a temporary restraining order,
seizure order, and order for expedited discovery, asset
restraint and to show cause for a preliminary injunction was
issued and was executed on May 24, 2006 (the "May 23 Order"
or the "Order").

On June 5, 2006, the Plaintiffs moved for contempt
arising out of the facts set forth below. A hearing of the
contempt motion and a trial of the underlying action were set
for April 24, 2007.

Following an evidentiary hearing unopposed by
Defendants on June 15, 2006, this Court entered a Preliminary
Injunction against Defendants (the "June 15 Order") which
required, inter alia, that:

1

Defendants shall deliver to Plaintiffs' attorneys,
within two (2) days from the date of this Order, all of
the documents, records, things and other items seized by
Plaintiffs' representatives during their execution of
the Order. . . .

The Plaintiffs sought discovery and, after efforts described
below, the Plaintiffs requested removal of the action from
the trial calendar and filed the instant motion for summary
judgment, which was marked submitted on June 6, 2007.

## The Facts

The facts with respect to discovery in this action,
the products of the Plaintiffs, and their efforts to enforce
their copyrights, as well as the conduct of the Defendants,
are set forth in the Plaintiffs' Local Rule 56.1 Statement,
which is unopposed. See Gubitosi v. Kapica, 154 F.3d 30, 31
(2d Cir. 1998) (accepting as true facts set forth in
unopposed Local Civil Rule 56.1 statement).

The Plaintiffs have been engaged for many years in
the business of manufacturing and distributing various types
of high-quality luxury products, including, inter alia,
watches, watch buckles, bracelets, scarves, handbags,
lighters, pens, belts, belt buckles, letter openers, and

eyewear under a number of trademarks and trade names ("Plaintiffs' Products"). Plaintiffs own the entire right, title and interest in and to Plaintiffs' federally registered trademarks (the "Plaintiffs' Marks"), most of which are incontestable.

Plaintiffs have used and are currently using the registered Plaintiffs' Marks in commerce in the United States and throughout the world in connection with their sale of Plaintiffs' Products. Over the years, Plaintiffs have enjoyed extraordinary success by designing, developing, and marketing an extensive line of luxury goods, which are known for their unique shapes, styles, and overall appearances.

Plaintiffs manufacture, merchandise, and market all of Plaintiffs' Products with a concern for design, artistry, workmanship, and material quality, as well as their projected image, goodwill and long-term growth. Plaintiffs have earned a reputation for high-quality luxury products. The Plaintiffs' policy is that only high-quality goods be produced under Plaintiffs' Marks and they maintain quality control over the manufacture, sale, and servicing of

3

Plaintiffs' Products throughout the United States and the world.

Each year, Plaintiffs spend millions of dollars in advertising, promoting, and developing Plaintiffs' Marks throughout the world. As a result, products bearing Plaintiffs' Marks are closely associated with Plaintiffs' reputation in the eyes of the public, customers, and the luxury goods industry. Plaintiffs' Marks have come to symbolize Plaintiffs' enormous goodwill and are invaluable assets of Plaintiffs.

Investigations commenced in July 2005 by Plaintiffs' representatives revealed that Defendants have imported, exported, distributed, advertised, offered for sale, and sold counterfeit watches bearing Plaintiffs' Marks, including A. Lange & Sohne, Cartier, Lanieres, Baignoire, Tortue, Tankissime, Panthere, Pasha de Cartier, 21 Chronoscaph, Santos de Cartier, Divan, Dunhill, Vacheron Constantin, Jaeger-Lecoultre, IWC, Montblanc, Piaget, Luminor, and Panerai (the "Counterfeit Products") through, among other locations, approximately fifteen websites (the "Websites"), including but not limited to those located at:

4

kingreplica.com, swisskingdom.com, vertexo.com,
davidluxury.com, davidsluxury.com, replicakingdom.com, and
watches-boutique.com.

Defendants Ilan Ben-Menachem ("Ilan"), Aviv Ben-
Menachem ("Aviv"), David Ben-Menachem ("David"), and Chana
Ben-Menachem ("Chana") operated the Websites, and
operated the following Defendant counterfeiting entities
(the "Defendant Businesses"): King Replica, Davids Luxury,
Replica Kingdom a/k/a Swiss Kingdom, Branded Luxury d/b/a BS
Gifts, Vertexo, Inc., Avilan Marketing LLC, and Travel Derech
Tslecha ("Travel").

The Defendants operated the Websites and Defendant
Businesses and sold and distributed the Counterfeit
Products from their home at 939 East 13th Street,
Brooklyn, New York, 11230 (the "Premises"), as well as
other locations. The Defendants had been operating their
Websites since at least May 2004 and through their Websites
and Defendant Businesses, advertised, offered for sale, and
sold counterfeit watches bearing copies of Plaintiffs'
Marks and designed to look exactly like genuine Plaintiffs'
Products. Plaintiffs did not in any way authorize or
consent to the Defendants' sale of the Counterfeit Products.

The Websites displayed photographs of watches bearing exact duplicates of Plaintiffs' Marks and designed to look like genuine Plaintiffs' Products.

The "Contact Us" page of the Website located at kingreplica.com (the "King Replica Website") listed for customer service the telephone number: 206-333-0050. An investigator for Plaintiffs called this telephone number and received a message that he had reached Branded Luxury customer service.

A database search for the King Replica Website revealed fifteen domain names listed on the same server, including the following watch-related websites: replicakingdom.com, davidsluxury.com, davidluxury.com, and watches-boutique.com.

A WhoIs database search for replicakingdom.com listed the following contact information: Ilan Ben-Menachem, 939 East 13th Street, Brooklyn, NY, 11230, Tel: 917-370-3154, Email: apogee91@gmail.com. A domain name system report for

replicakingdom.com confirmed that the host master email address was apogee91@gmail.com.

A WhoIs database search for vertexo.com listed the following contact information: Vertexo Web Designs, Ilan Ben-Menachem, 939 East 13th Street, Brooklyn, NY, 11230, Tel: 917-370-3154, Email: ilanbm@hotmail.com.

Domain name system reports for davidsluxury.com indicated that the host master email address for the site was ilan@vertexo.com.

On August 10, 2005, an investigator for Plaintiffs accessed the King Replica Website and ordered a watch bearing Plaintiffs' Cartier Marks for $246.00. On August 11, 2005, Plaintiffs' investigator received an email from "David Angelino" at sales@kingreplica.com inquiring whether he wanted the male Cartier Tank watch. Plaintiffs' investigator responded, requesting a male Cartier Tank watch. On August 23, 2005, Plaintiffs' investigator received a package with an EMS/China Posting Tracking sticker on it bearing a return address in Chinese (the "Package").

The Package contained a white box bearing the

mark Cartier. Inside the white box was a red leather box bearing the mark Cartier. The box contained one men's silver watch in the Cartier Tank design and bearing the mark Cartier on the watch face, watch back, and wristband clasp (the contents of the Package are collectively referred to herein as the "Counterfeit Watch").

Upon inspection, Plaintiffs' representative confirmed that the Counterfeit Watch is not a genuine Plaintiffs' watch but rather an inferior counterfeit replication. On August 23, 2005, Plaintiffs' investigator noted a credit card charge of $246.00, the price paid for the Counterfeit Watch, charged by BS Gifts, Tel: 718-701-3323.

An internet search for telephone number 718-701-3323 revealed that it is listed as the contact number on Defendants' Website davidsluxury.com.

Defendants' Website davidsluxury.com additionally lists an address of "PMB 122 28262 Chardon Rd., Willoughby Hills, Oh, 44092."

On March 23, 2006, another Plaintiffs' investigator

8

sent an email to sales@kingreplica.com inquiring about purchasing a watch bearing the Cartier mark with a money order. Later that same day, Plaintiffs' investigator received a reply email from "David Angelino" stating that she could send a money order to: Branded Luxury, 130 Church Street #361, New York, NY, 10007. This reply email listed the Defendants' Website swisskingdom.com under the electronic signature for David Angelino. On March 27, 2006, Plaintiffs' investigator sent a money order in the amount of $315.00 to 130 Church Street #361, New York, NY, 10007, to purchase a watch bearing the Cartier marks. On March 31, Plaintiffs' investigator received an email from sales@kingreplica.com by "David Moreno" stating that the money order was received and the order was being processed. On April 10, 2006, Plaintiffs' investigator received a package which contained a white cardboard sleeve with the Cartier mark printed on it, as well as a red box bearing the Cartier mark. Inside this package, Plaintiffs' investigator found a watch, silver in color, in the Cartier Tank design (the "Second Counterfeit Watch") and bearing the Cartier marks on the face, watch back and wristband.

Plaintiffs' investigator marked the Second Counterfeit Watch as evidence for identification and

photographed it. Upon inspection, Plaintiffs' representative confirmed that the Second Counterfeit Watch is not a genuine Plaintiffs' watch but rather an inferior counterfeit replication.

Pursuant to the May 23 Order, on May 24, 2006, Plaintiffs' investigators and attorneys, accompanied by a police officer, arrived at the Premises to conduct a seizure. They were met at the front door of the Premises by a woman who stated that no one else was present, and that she did not know anything about a counterfeit watch operation.

After gaining entry to the house, Plaintiffs' representatives discovered that a young man, two teenage girls, and a preteen boy, all apparently residents of the house, and a housekeeper were inside. The young man refused to identify himself, but picture identification discovered later that he was Defendant Aviv Ben-Menachem. Plaintiffs' attorney advised Aviv to call his attorney, as well as Defendants Ilan, Chana, and David. Aviv replied that he could not reach any of them.

Throughout Plaintiffs' execution of the Order, Aviv behaved in an aggressive and threatening manner towards

Plaintiffs' representatives. At the urging of Plaintiffs'
representatives, Aviv called 9-1-1, leading to the arrival of
five additional uniformed police officers at the Premises.
These officers confirmed that Aviv must cooperate with
Plaintiffs' representatives in their execution of the Order.
Aviv proceeded to follow Plaintiffs' representatives around
the house, attempting to hide evidence, and generally
disrupting the seizure and execution of the Order.

Plaintiffs' representatives collected several
watches and watch boxes bearing Plaintiffs' Marks, one
entire banker's box and separate file folder of documents
relating to Defendants' counterfeit watch business, and two
computer towers and a laptop computer likely used in
Defendants' counterfeit watch business. Among the documents
collected by Plaintiffs' representatives were documents that
demonstrated:  (a) that Defendants were selling large
quantities of replica watches on the Websites; (b) that
Defendants were corresponding with entities and individuals
in Hong Kong and China to import and distribute Counterfeit
Products; (c) that Defendants had set up off-shore accounts
and foreign corporations, including in Panama; (d) that
Defendant Ilan Ben-Menachem reported an income of $800,000
in 2005; and (e) that Defendants were selling several

hundred thousand dollars of counterfeit watches, including the Counterfeit Products, monthly. Plaintiffs' representatives photographed and placed evidence tags on watches bearing Plaintiffs' Marks presumed to be Counterfeit Products.

When one of Plaintiffs' investigators was nearly finished with boxing and tagging as evidence watches bearing Plaintiffs' Marks and documents relating to Defendants' counterfeit watch business, he was alone on the first floor of the house. Plaintiffs' investigator had in his possession at this time a banker's box and file folder of documents, a laptop, two computer towers, and an evidence bag containing ten watches bearing Plaintiffs' Marks and several watch boxes. He was then confronted by Aviv and an unidentified man seen earlier outside the Premises. Aviv and the unidentified man approached Plaintiffs' investigator, pushed him, and tried to hit him. The unidentified man grabbed the folder of documents and ran from the room. Plaintiffs' investigator clutched the box of documents firmly as Aviv and the unidentified man, who had returned to the room, tried to push Plaintiffs' investigator to the ground, and tried to wrest the box of documents from his hands. Aviv and the unidentified man succeeded in

ripping the box of documents, sending documents flying, and gathered the ripped box and documents and ran out the front door.

The police officer accompanying Plaintiffs' representatives had taken possession of a lockbox located in the Travel Derech Tslecha office in the basement of the house. Defendant Chana Ben-Menachem arrived at the house and began to attack the police officer holding the lockbox. Chana then tried to grab the evidence bag described above. Plaintiffs' representatives and the police officers tried to prevent Chana from taking the bag. The laptop computer and evidence bag were then placed on the coffee table just inside the front door on the first floor.

Chana then handed one of Plaintiffs' attorneys a cordless phone and informed him that her attorney, Asher White, was on the line and wished to confer. Plaintiffs' attorney began to speak with White about the Plaintiffs' execution of the Order.

While the police officers (totaling approximately ten, uniformed and undercover) were speaking with Plaintiffs' representatives on the front porch and

13

Plaintiffs' attorney was speaking with Defendants' attorney, Chana locked the front door of the house and drew the blinds. She refused to open the door when the police officers knocked. When uniformed police officers regained entry to the house, Plaintiffs' representatives noticed that the evidence bag and the laptop computer, which had all been on the coffee table just inside the doorway, were missing. Plaintiffs' representatives were not able to recover from the house the documents, laptop computer, or the evidence bag of watches bearing Plaintiffs' Marks described above, or the lockbox described above, and were forced to leave the Premises without this evidence.

Pursuant to the May 23 Order, on May 24, 2006, Plaintiffs' investigators and attorney, accompanied by a police officer, also entered the premises of 1367 Coney Island Avenue, Brooklyn, NY, 11230, to conduct a seizure. This location had been used by Defendants as an office to operate their counterfeit watch business. At 1367 Coney Island Avenue, Plaintiffs' representatives seized approximately one folder of business records relating to Defendants' counterfeit watch business, as well as a postal scale, shipping labels, and envelopes. Documents seized at 1367 Coney Island Avenue corroborate the documents gathered

14

by Plaintiffs' representatives at the Premises but absconded with by Defendants.

Documents seized at 1367 Coney Island Avenue included evidence of:

> (a) a wire transfer on March 30, 2006, in the amount of $36,250.00 from Defendant Avilan Marketing LLC into an off-shore account in the name of Defendant Chana Ben-Menachem;
>
> (b) a merchant application to Credicorp Bank on behalf of Luxury Goods, Inc., identified on the application as a corporation existing in Panama City, Panama, to provide credit card processing for the website bagsnstyle.com. The merchant application estimates a monthly sales volume on the website of $600,000. This application was faxed to Credicorp Bank from Defendant Travel Derech Tslecha.

Starting on May 24, 2006, the day Plaintiffs' representatives attempted to execute the May 23 Order at the Premises, Plaintiffs' attorneys were in contact with Defendants' then-counsel, Asher White ("White"), concerning

Defendants' physical attacks on Plaintiffs' investigators
and Defendants' absconding with and hiding of the
Counterfeit Products and other evidence gathered by
Plaintiffs' representatives.

On May 30, 2006, White asked Plaintiffs' counsel
to forgo filing a Motion for Contempt and represented to
Plaintiffs' counsel that Defendants would return all
documents and things hidden by Defendants during the
execution of the May 23 Order. On May 31, 2006, White
informed Plaintiffs' counsel that Defendants had provided to
him what Defendants represented were all of the documents and
things collected by Plaintiffs' representatives during the
execution of the Order. White confirmed that these items
included the evidence bag of Counterfeit Products collected
by Plaintiffs' representatives. Later on May 31, 2006,
Plaintiffs' messenger retrieved the items described above
from White's office and delivered them to Plaintiffs'
counsel.

The items retrieved from White's office consisted of
a banker's box, approximately one-eighth full of documents,
two computer towers, and a laptop computer. The banker's
box appeared to be the same box used by Plaintiffs'

16

representatives to gather documents during the execution of
the Order.  The box had writing on the top identifying where
in the Premises the collected documents were found.  The box
also appeared to be ripped and bent in a way that comports
with the struggle over the box between Plaintiffs'
investigator and Aviv and the unknown man.

The documents retrieved from White's office,
however, did not include the folder of documents collected
by Plaintiffs' representatives during the execution of the
Order and taken back by Defendants.  The documents also did
not include the following documents which Plaintiffs'
representatives had collected during the execution of the
Order: (a) documents evidencing Defendants' sales of large
quantities of Counterfeit Product on the various Defendants'
Websites; (b) documents evidencing Defendants' partnership
with entities and individuals in Hong Kong and China to
import and distribute counterfeit watches; (c) documents
evidencing Defendants' establishment of several off-shore bank
accounts and foreign corporations, including in Panama; (d)
documents evidencing Defendants' wire transfers of large
sums out of the United States; (e) Defendant Ilan Ben-
Menachem's tax return; and (f) documents evidencing
involvement of Chana and Travel in the counterfeit watch

operation.

The documents provided by White included documents
that Plaintiffs' representatives had not originally collected
which had nothing to do with Defendants' counterfeit watch
business.

White did not provide to Plaintiffs' counsel any of
the watches or watch boxes bearing Plaintiffs' Marks that had
been collected by Plaintiffs' representatives and put into an
evidence bag during the execution of the Order.

Additionally, a large number of files, including
those in folders bearing the name "Cartier" and other of
Plaintiffs' brands, had been deleted from the laptop
provided by White.

After Plaintiffs' counsel reviewed the items
retrieved from White, he telephoned White and told him of the
missing documents and items. White confirmed that those
items comprised everything that had been provided to him by
Defendants.

On November 1, 2006, Defendants Aviv, Ilan, Avilan

Marketing LLC, Branded Luxury, Davids Luxury, King Replica, Replica Kingdom, and Vertexo, Inc. filed an opposition to Plaintiffs' Motion for Contempt.

Aviv admitted in his sworn declaration to taking items from Plaintiffs' representatives during the execution of the Order. He also admitted to disposing of the watches and watch boxes bearing Plaintiffs' Marks collected by Plaintiffs' representatives despite the fact that he had been served by the Order and was already represented by counsel.

Ilan and Aviv, King Replica, Davids Luxury, Branded Luxury d/b/a BS Gifts, Avilan Marketing LLC, and Vertexo, Inc. admitted in interrogatory responses to disposing of the Counterfeit Products described above and that they refused to comply with the Order and deliberately prevented Plaintiffs from executing the Order by (a) physically attacking Plaintiffs' representatives, (b) barring access to the Premises, (c) concealing the Counterfeit Products, and (d) forcibly taking back documents and items that had been identified and collected by Plaintiffs pursuant to the Order.

Aviv admitted he knew that the Counterfeit Products collected by Plaintiffs' representatives during execution

of the Order "were replica watches" and that he and Ilan
were in the watch business selling replica watches.

Following the entry of the June 15 Order, on July
25, 2006, former counsel for Aviv, Ilan, Avilan Marketing
LLC, Branded Luxury d/b/a BS Gifts, Davids Luxury, King
Replica, Replica Kingdom a/k/a Swiss Kingdom, and Vertexo,
Inc. filed a letter representing to the Court that these
Defendants had produced all documents requested by Plaintiffs
within the possession custody or control of these Defendants.

On June 29 and August 7, 2006, Defendants produced
only approximately 200 pages of documents, collectively,
while Plaintiffs collected approximately eight times that
amount during their execution of the May 23 Order.  These
documents produced by Defendants do not include those
collected by Plaintiffs' representatives during the execution
of the Order which were taken back by Defendants.

The June 15 Order additionally required that:

Defendants shall deliver to Plaintiffs' attorneys,
within ten (10) days from the date of this Order,
copies of all accountant's reports, bank statements,
tax returns, certificates of deposit, notes, bonds,
checking accounts, trust accounts, money market or GNMA

20

accounts, savings accounts or other financial institution records or documentation showing investments or deposits, and documents indicating title to any real or personal property in each of the Defendants' actual or constructive possession or control.

Defendants have not provided to Plaintiffs any information about overseas accounts in the names of David and Chana or any information about funds transferred into those accounts.

On December 12, 2006, Plaintiffs served counsel for Ilan, Aviv, King Replica, Replica Kingdom a/k/a Swiss Kingdom, Davids Luxury, Branded Luxury d/b/a BS Gifts, Avilan Marketing LLC, and Vertexo, Inc. with Plaintiffs' First Requests for the Production of Documents and Things and Plaintiffs' First Set of Interrogatories ("Plaintiffs' Interrogatories"), returnable January 2, 2007. In response to Plaintiffs' Interrogatories, Defendants Ilan, Aviv, King Replica, Davids Luxury, Branded Luxury d/b/a BS Gifts, Avilan Marketing LLC, and Vertexo, Inc. maintained that Plaintiffs' representatives had been given all documents, electronic or otherwise, relating to the Counterfeit Products. The response to Plaintiffs' Interrogatories admits that watches were acquired from a source in China.

David has admitted that funds were wired to China from the Travel account to purchase merchandise at the request of Aviv and Ilan.

Aviv and Ilan, along with their companies, admitted to attempting to start overseas businesses and to having foreign contacts, including contacts with companies in the United Kingdom, Hong Kong, the Philippines, and Panama.

Though Aviv and Ilan, and the Defendant Businesses (excluding Defendant Travel Derech Tslecha), including Defendant Avilan Marketing, deny forming foreign entities and opening foreign accounts, financial records obtained by Plaintiffs' subpoenas show that Defendant Avilan Marketing transferred over $200,000 to overseas accounts maintained by David and Chana. Defendants have refused to provide any information about these accounts.

The response to Plaintiffs' Interrogatories admits that "Bagsnstyle.com" operated on servers of Defendants. Though "LaPeree.com," "LaPeree Distribution Center," and "LaPeree Malls" are mentioned on Defendants' website replicakingdom.com, the response to Plaintiffs' Interrogatories denies knowledge of any such entities.

On or about March 1, 2007, Plaintiffs' counsel served Notices of Deposition of David, Chana, Aviv, and Ilan on the respective Defendant's counsels for March 15, 16, 19, and 20. From the time of the hearing on Plaintiffs' Motion for Contempt on January 25, 2007, through the deposition dates, until the close of discovery on March 22, 2007, Plaintiffs' counsel made numerous calls to each Defendant's counsel in an attempt to schedule these depositions.

Former counsel for Ilan, Aviv, King Replica, Replica Kingdom, Swiss Kingdom, Davids Luxury, Branded Luxury d/b/a BS GIFTS, Avilan Marketing LLC, and Vertexo, Inc. informed Plaintiffs' counsel that his clients would not appear at the depositions.

Counsel for David and Chana and Travel also informed Plaintiffs' counsel that his clients would not appear at the depositions.

White filed a Motion to be Relieved as Counsel, citing his clients' non-communication, on February 27, 2007. The Court granted this motion on March 26, 2007.

David has admitted that he and Chana, his wife, "set up the account" and gave approximately $150,000 to their sons, Ilan and Aviv, to start the counterfeiting operations. Financial records obtained by Plaintiffs' subpoenas confirm that David and Chana maintain overseas accounts and received large transfers from Defendant Avilan Marketing LLC.

Records obtained by Plaintiffs' subpoena to Central Bancard LLC shows two different merchant accounts opened by David and Chana. Account number 204026 with Central Bancard LLC was for Defendant Branded Luxury (the "Branded Luxury Merchant Account"). The application for the Branded Luxury Merchant Account indicated that Defendant Branded Luxury is a sole proprietorship wholly-owned by David Ben-Menachem. This application provided Travel Derech Tslecha as a merchant reference and "Hanna" as the contact person.

The Branded Luxury Merchant Account application described the merchandise being sold as "watches" and shows that the online store is located at www.kingreplica.com. The application indicated that proceeds from the Branded Luxury Merchant Account were to be transferred into a Washington Mutual Bank account ending in digits -516. A sales report

for the Branded Luxury Merchant Account provided by Central
Bancard LLC shows $124,280 in credit card sales over a period
of approximately four months for kingreplica.com.

The Washington Mutual Bank account is in the name
of Defendants Branded Luxury, David, and Chana (the "Branded
Luxury Checking Account"). Statements for the Branded
Luxury Checking Account show monthly deposits of tens of
thousands of dollars from the Branded Luxury Merchant
Account. The Branded Luxury Checking Account was also used
to make monthly payments to "Google Ad Words". These
payments indicate that Defendants paid Google, the internet
search engine, to feature Defendants' Websites prominently in
paid advertisement search results when Google users entered
search requests related to replica watches.

The Branded Luxury Checking Account was used by
David and Chana to pay their own personal expenses and
David and Chana also transferred funds from the Branded
Luxury Checking Account into their many other accounts,
including overseas accounts.

Defendants used the Branded Luxury Checking Account
to transfer funds into and out of accounts in the name of

Travel, as well as among their personal accounts. David
signed checks for payments from the Branded Luxury Checking
Account, and Chana endorsed them to make deposits into an
account in the name of Travel.

The two computer towers seized by Plaintiffs'
representatives during execution of the May 23 Order contain
document folders containing document files related to
counterfeit watches, intermingled with David's academic
papers. These documents include: a copy of defendant
David's New York driver's license next to a copy of a
cancelled check from the Branded Luxury Checking Account; a
memorandum from David to Central Bancard LLC entitled "How
I Will Avoid Chargebacks in the Future"; and a compilation of
standard correspondence to buyers of counterfeit watches.
Some of these form letters are from Aviv at the 1367 Coney
Island Avenue address, others from "B. Luxury" at 130 Church
Street, others from "David Angelino" and others from "David
Moreno".

Ilan and Vertexo, Inc. have previously been sued
for trademark counterfeiting relating to their Website
bagnstyle.com in another judicial district of this Circuit.

See Louis Vuitton Malletier S.A. et al. v. Ben-Menachem et al., No. CV 05-4844 (E.D.N.Y. filed Oct. 14, 2005).

Ilan and Branded Luxury, LaPeree Distribution Center, as well as Websites davidsluxury.com, replicakingdom.com, kingreplica.com, and swisskingdom.com were sued for trademark counterfeiting in another judicial district of this Circuit. See Rolex Watch U.S.A., Inc. v. Ben-Menachem et al., No. 06 Civ. 6687 (E.D.N.Y. filed Dec. 20, 2006).

## The Summary Judgment Standard

In deciding a motion for summary judgment, a court shall render judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).

The moving party has the initial burden of showing

27

that there are no material facts in dispute, Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case, Celotex, 477 U.S. at 325. The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), as to every element "essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." Eastway Constr. Corp. v. New York, 762 F.2d 243, 249 (2d Cir. 1985). However, the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there is not, summary judgment is proper. See id. at 249-50.

It is the law of this Circuit that "even when a nonmoving party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the

28

moving party's submission to determine if it has met its
burden of demonstrating that no material issue of fact
remains for trial" and that summary judgment is appropriate
as a matter of law. Amaker v. Foley, 274 F.3d 677, 681 (2d
Cir. 2001); see also Vt. Teddy Bear, 373 F.3d 241, 244 (2d
Cir. 2004); Mattel, Inc. v. Pitt, 229 F. Supp. 2d 315, 320
(S.D.N.Y. 2002). In determining whether the moving party
has met its burden, the court must be satisfied that the
citation to evidence in the record supports the assertion.
Vt. Teddy Bear, 373 F.2d at 244 (citing Giannullo v. City of
N.Y., 322 F.3d 139, 143 n.5 (2d Cir. 2003)).

## Defendants are Liable for Trademark Counterfeiting and Infringement

A plaintiff will prevail on its claims of trademark
counterfeiting and infringement under 15 U.S.C. § 1114(1)(a)
of the Lanham Act if it establishes that (1) it possesses a
valid mark entitled to Lanham Act protection, and (2)
defendant used a similar mark in commerce in a manner
likely to cause confusion among the relevant consuming
public. See Lorillard Tobacco Co. v. Jamelis Grocery, Inc.,
378 F. Supp. 2d 448, 454 (S.D.N.Y. 2005). The Lanham Act
imposes liability upon on a person who sells, offers for

29

sale, advertises or distributes goods using a counterfeit of a registered trademark, 15 U.S.C. § 1114(1)(a), regardless of "whether or not the person against whom relief is sought knew such mark was so registered," 15 U.S.C. § 1116(d)(B)(i).

Plaintiffs have established their ownership and registration with the United States Patent and Trademark Office of the Plaintiffs' Marks. These registrations are prima facie evidence of the validity of the trademarks Plaintiffs seek to protect, as well as the exclusive rights of Plaintiffs to use the Plaintiffs' Marks in commerce and in connection with the goods or services specified in the registration certificates. See 15 U.S.C. § 1057(b). Other than filing Answers generally denying the allegations in Plaintiffs' Complaint, Defendants have submitted no evidence on this motion that Plaintiffs' trademarks are not valid.

In the course of this action, Plaintiffs have identified nineteen different registered trademarks which Defendants have counterfeited: A. LANGE & SOHNE, BAIGNOIRE, CARTIER, DIVAN, DUNHILL, IWC, JAEGER-LECOULTRE, LANIERES, LUMINOR, MONTBLANC, PANERAI, PANTHERE, PASHA DE CARTIER, PIAGET, SANTOS DE CARTIER, TANKISSIME, TORTUE, VACHERON

30

CONSTANTIN, and 21 CHRONOSCAPH.

The Plaintiffs have also established that Defendants were importing, distributing, advertising, offering for sale, and selling counterfeit reproductions of Plaintiffs' Marks likely to cause consumer confusion. To determine the likelihood of confusion, courts in this Circuit apply the eight-factor test of Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495-96 (2d Cir. 1961). In cases involving counterfeit marks, however, this Court has found it unnecessary to perform a Polaroid examination because "counterfeit marks are inherently confusing." Lorillard, 378 F. Supp. 2d at 455 (citing Philip Morris USA Inc. v. Felizardo, No. 03 Civ. 5891 (HB), 2004 WL 1375277, at *5 (S.D.N.Y. June 18, 2004); Gucci America, Inc. v. Duty Free Apparel, Ltd., 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) (noting that "confusing the customer is the whole purpose of creating counterfeit goods")). As found above, while executing the May 23 Order, Plaintiffs' representatives found watches bearing copies of Plaintiffs' Marks at Defendants' home, as well as documentary evidence of Defendants' operation of a complex, lucrative business selling Counterfeit Products. Defendants have not disputed that these watches were Counterfeit Products or that they

were in the business of selling counterfeit watches.
Defendants Aviv and Ilan have admitted to knowingly
distributing and selling the Counterfeit Products for
themselves and the business entities King Replica, Davids
Luxury, Replica Kingdom a/k/a Swiss Kingdom, Branded Luxury
d/b/a BS Gifts, Vertexo, Inc., and Avilan Marketing LLC.

David and Chana and Travel Derech Tslecha continue
to deny knowledge of the counterfeiting business operating
from their home, although they admit that they were actively
involved. Their denials, however, are not credible and are
not supported by any evidentiary submission. David and Chana
admit that they set up accounts to transact the business of
the counterfeiting operation and gave approximately $150,000
to their sons to start the counterfeiting operation. Numerous
transfers were made from counterfeiting bank accounts into
personal accounts of David and Chana, as well as the account
of Travel Derech Tslecha. Given the admission that various
Defendant business entities and their financial accounts were
opened in David and Chana's names, and that the large
counterfeit watch import, distribution, and sales business
operated from their home, David's declaration that he did not
know what the funds were being used for lacks credibility.

David and Chana were: (1) the owners and
residents of the home in which counterfeit operations
occurred openly; (2) direct financial beneficiaries of the
counterfeiting operations, in part through deposits into their
off-shore accounts; and (3) are the parents of admitted
counterfeiters Ilan and Aviv. Documents relating to
Counterfeit Products and Defendants' Websites, including a
document authored by David, were found in David's computer
folders, David and Chana jointly owned a bank account with
admitted counterfeiting entity Defendant Branded Luxury,
withdrawals from bank accounts of admitted counterfeiting
entities were deposited into the purported business account
of Travel, Branded Luxury is a sole proprietorship of
David, and transfers of funds overseas from the Travel
account were made at the behest of Ilan and Aviv.

Since a seller bears strict liability for
violations of the Lanham Act, even an "innocent" individual
who sells goods bearing an infringing mark is liable for
trademark infringement -- intent is not required. See
Procter & Gamble Co. v. Quality King Distribs., Inc., 123 F.
Supp. 2d 108, 112 (E.D.N.Y. 2000) ("[T]he registrant need
not prove intent in order to succeed on the issue of
liability" under the Lanham Act).

Even if David and Chana and Travel were not
directly involved in the sale of the Counterfeit Products,
they remain liable for contributory trademark infringement
because they chose to be willfully blind to the
counterfeiting business operated by two of their sons from
the Ben-Menachem home, also the location of the Travel
office, which involved David's computer and Defendants' bank
accounts.

It is well established that "liability for
trademark infringement can extend beyond those who actually
mislabel goods with the mark of another." Inwood Lab., Inc.
v. Ives Lab., Inc., 456 U.S. 844, 853 (1982); see also, Grant
Airmass Corp. v. Gaymar Indus., Inc., 645 F. Supp. 1507, 1511
(S.D.N.Y. 1986) ("[L]iability under the Lanham Act has been
construed to extend beyond those who actually misrepresent
goods or directly place such goods in commerce"); Carter
Int'l B.V. v. Liu, No. 02 Civ. 7926 (TPG), 2003 WL 1900852,
at *3 (S.D.N.Y. Apr. 17, 2003) (finding an indirect actor
liable for trademark counterfeiting when the party knew or
had reason to know it was engaging in trademark
infringement). This Court has recognized "that one may be
held liable as a contributory infringer, not withstanding the
fact that one does nothing to assist an infringing party."
Power Test Petroleum Distribs. v. Manhattan & Queens Fuel

34

Corp., 556 F. Supp. 392, 395 (S.D.N.Y. 1982) (citation omitted). A contributor who knew or had reason to know of the Lanham Act violations or was "willfully blind" to the violations is liable for trademark infringement. Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 264-65 (9th Cir. 1996).

Even if the denials of David and Chana were to be accepted as plausible, the facts establish that David and Chana and Travel were "willfully blind" to the activities and not only failed to investigate, but also assisted their co-Defendants' sales of the Counterfeit Products. Accordingly, David and Chana and Travel are at the very least liable for contributory trademark infringement.

When, as here, a plaintiff has satisfied all statutory proof requirements and absent a dispute of material facts, that plaintiff is entitled to a grant of summary judgment. See, e.g., Lorillard Tobacco Co., 378 F. Supp. 2d at 456; Felizardo, 2004 WL 1375277, at *5; Fendi S.a.S. Di Paola Fendi E Sorelle v. Cosmetic World, Ltd., 642 F. Supp. 1143, 1145 (S.D.N.Y. 1986). Defendants have not put forth any evidence to dispute the facts material to Plaintiffs' Lanham Act claims, thus creating no justifiable

issues as to liability on these claims. See Felizardo, 2004
WL 1375277, at *3.

Due to the clear weight of the evidence of
Defendants' importing, distributing, advertising, offering
for sale, and sale of Counterfeit Products, the Plaintiffs'
summary judgment motion on their claims of trademark
counterfeiting and infringement is granted.

## Defendants are Liable for Federal Unfair Competition and State and Common Law Claims

The Lanham Act extends liability to any person who
uses in commerce in connection with goods or services any
mark or false designation of origin likely to cause
confusion or otherwise "deceive as to the affiliation,
connection, or association of such person with another
person, or as to the origin, sponsorship, or approval of his
or her goods, services, or commercial activities by another
person." 15 U.S.C. § 1125(a)(1). The stated intent of the
Lanham Act is to protect persons engaged in commerce against
unfair competition. See 15 U.S.C. § 1127. When a plaintiff
presents a successful claim of federal trademark
infringement, it is not necessary to present further proof to

succeed on a claim of federal unfair competition. See
Russian Kurier, Inc. v. Russian Am. Kurier, Inc., 899 F.
Supp. 1204, 1208 (S.D.N.Y. 1995). See also Lorillard, 378 F.
Supp. 2d at 454 (citing Arrow Fastener Co., Inc. v. Stanley
Works, 59 F.3d 384, 390 (2d Cir.1995)). Because Plaintiffs
have presented a successful claim of federal trademark
infringement, Defendants are also found liable for federal
unfair competition under Section 1125(a).

The same acts that constitute trademark
counterfeiting and unfair competition under federal laws
give rise to Plaintiffs' claims of common law trademark
infringement and unfair competition, as well as unfair
competition under New York law. Unfair competition under New
York law additionally requires evidence of bad faith. See
Felizardo, 2004 WL 1375277, at *6. However, "a presumption
of bad faith attaches to the use of a counterfeit mark." Id.;
see also Lorillard, 378 F. Supp. 2d at 456. Defendants' sale
of the Counterfeit Products serves to establish bad faith
under New York law, and therefore summary judgment is
appropriate as to these claims. Defendants are also liable
for trademark infringement, trade name infringement, and
unfair competition under New York state and common law. See
Russian Kurier, Inc., 899 F. Supp. at 1208.

37

**Defendants Are Liable for Statutory Damages**

Because "counterfeiters' records are frequently non-existent, inadequate or deceptively kept . . ., making proving actual damages in these cases difficult, if not impossible," Lorillard, 378 F. Supp. 2d at 458 (citations omitted), the Lanham Act permits a statutory damage award in lieu of an award of actual damages resulting from the use of counterfeit marks. The Act permits an award "not less than $500 or more than $100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. 1117(c). If the court finds that the use of the counterfeit mark was willful, the court may award damages in an amount "not more than $1,000,000 per counterfeit mark per type of goods sold, offered for sale, or distributed." Id.

Plaintiffs have shown that for a period of approximately four months, a merchant account in the name of Defendant Branded Luxury, opened by David, processed $124,280 in credit card sales. Since the initiation of the instant action, Plaintiffs have diligently attempted to discover the full extent of Defendants' counterfeiting activities. For

several months, Defendants refused to provide any information, claiming that they had produced all documents in their possession to Plaintiffs' counsel. After Plaintiffs were forced to subpoena voluminous records from financial institutions, it became apparent that the documents provided by Defendants are incomplete and thus there is no way to determine actual damages. Statutory damages are therefore appropriate in this case.

Courts have wide discretion in setting an amount of statutory damages. See Silhouette Int'l Schmied Ag v. Vachik Chakhbazian, No. 04 Civ. 3613, 2004 WL 2211660, at *2 (S.D.N.Y. Oct. 4, 2004); see also Philip Morris USA Inc. v. Marlboro Express, No. 03 Civ. 1161, 2005 WL 2076921, at *6 (E.D.N.Y. Aug. 26, 2005). In awarding statutory damages, courts consider a variety of factors, including whether a defendant's conduct was willful, lost revenue and harm to the plaintiff, the value of the plaintiff's marks, the defendant's cooperation in providing information on the value of the infringing material, and the deterrent effect on the defendant and others. Duty Free Apparel, Ltd., 315 F. Supp. 2d 511, 520. Conduct can be found to be willful "whether the defendant had knowledge that his conduct represented infringement or perhaps recklessly disregarded the

possibility." Lorillard, 378 F. Supp. 2d at 457 n.13 (citing

Felizardo, 2004 WL 1375277 at *7). A defendant's knowledge

can be "actual or constructive." Fitzgerald Publ'g Co.,

Inc. v. Baylor Publ'g Co., Inc., 807 F.2d 1110, 1115 (2d

Cir. 1986). Knowledge, therefore, "need not be proven

directly but may be inferred from the defendant's conduct."

N.A.S. Import, Corp. v. Chenson Enters., Inc., 968 F.2d 250,

252 (2d Cir. 1992) (citing Fallaci v. New Gazette Literary

Corp., 568 F. Supp. 1172, 1173 (S.D.N.Y. 1983)).


Plaintiffs seek enhanced statutory damages in light

of the evidence that Defendants' conduct was "willful" under

Section 1117(c). However, the Court concludes that standard

statutory damages in the amount of $50,000 for each of

Plaintiffs' nineteen Marks counterfeited by Defendants will

be sufficient to meet the goals of the statute, including

compensating the Plaintiffs and deterring future violations.

Cf. Lorillard, 378 F. Supp. 2d at 457 (finding standard

statutory damages would provide "sufficient redress and

deterrence" despite likelihood that plaintiffs could prove

willfulness, and noting the court's "doubts as to whether

enhanced damages would be recoverable"; Malletier v.

&#x265B; &#x2022;&#x2039; &#x2022;

Whenu.Com, Inc., No. 05 Civ. 1325 (LAK), Slip Op., 2007 WL
257717, at * 6 (S.D.N.Y. Jan. 26, 2007) (awarding a total of
$1,100,000 for infringement of 11 marks and discussing cases
awarding less than the per-mark maximum).

## Defendants Are Liable for Costs and Attorneys' Fees

Having prevailed on its claims for willful
infringement and unfair competition, Plaintiffs are entitled
to an award of costs and reasonable attorney's fees.  15
U.S.C. § 1117(a); see also Silhouette, 2004 WL 221660, at *3
(citing Rolex Watch U.S.A., Inc. v. Brown, No. 01 Civ. 9155
(AJP), 2002 WL 1226863, at *3 (S.D.N.Y. June 5, 2002)).

## Defendants Are Permanently Enjoined

Section 34(a) of the Lanham Act provides courts
with the power to grant injunctive relief to prevent the
violation of a trademark owner's rights.  15 U.S.C. §
1116(a); see Lorillard, 378 F. Supp. 2d at 459.  Plaintiffs
have shown that they are entitled to a permanent injunction
based on: (1) actual success on the merits, and (2)
irreparable harm.  Id.  Plaintiffs have established that
Defendants have violated the Lanham Act by engaging in the

41

counterfeiting activities described in the Complaint and, therefore, the Plaintiffs are granted entry of a permanent injunction.

## Conclusion

Summary judgment against Defendants is granted for importing, distributing, advertising, selling, and offering for sale the Counterfeit Products, and permanently enjoining Defendants' counterfeiting and infringing activities as set forth in the Complaint, and awarding Plaintiffs statutory damages against Defendants in the amount of $950,000, as well as costs and attorneys' fees. Plaintiffs will submit judgment on notice, as well as a supporting affidavit with respect to attorneys' fees.

It is so ordered.

**New York, N.Y.**
**December** _/Q_ **, 2007**

ROBERT W. SWEET
**U.S.D.J.**